302 P.3d 1072

**In the Matter Of The Driver's License Suspension Of Karen Ann KIMBLEY.**

**Karen Ann Kimbley, Petitioner–Respondent,**

v.

**State Of Idaho, Transportation Department, Respondent–Appellant.**

No. 39829.

Court of Appeals of Idaho.

June 4, 2013.

Hon. Lawrence G. Wasden, Attorney General; Edwin L. Litteneker, Special Deputy Attorney General, Lewiston, for appellant. Edwin L. Litteneker argued.

McCormick & Rokyta, PLLC, Moscow for respondent. Deborah Lynn McCormick argued.

GRATTON, Judge.

The Idaho Transportation Department (ITD) appeals from the district court's order vacating the hearing officer's decision to sustain the suspension of Karen Ann Kimbley's driver's license. ITD claims the district court erred by determining the hearing officer's decision was not supported by substantial and competent evidence in the record. ITD specifically argues the hearing officer correctly found that Kimbley, prior to submitting a breath test, was properly monitored in accordance with the Idaho State Police Standard Operating Procedure (SOP).

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 6, 2011, at approximately 9:13 p.m., Latah County Sheriff's Deputy Duke conducted a traffic stop of Kimbley for driving erratically. The deputy subsequently made contact with Kimbley and suspected she was under the influence of alcohol because of her driving, state of confusion, and trouble finding the appropriate documentation. After the deputy checked her eyes for nystagmus and Kimbley admitted she had a drink, the deputy informed Kimbley she was under arrest for DUI. Kimbley was then transported to the Latah County Jail.

At the jail, Deputy Duke checked Kimbley's mouth at 10:08:17 for anything that would affect a breath test. After approximately twenty-one minutes, Kimbley made three failed attempts to provide a sufficient breath sample.[1] After a second fifteen-minute monitoring period, Kimbley then provid-

1. After the first monitoring period, the recording of Kimbley stops. According to both parties, once the recording resumes, Deputy Duke is in the process of explaining to Kimbley that she failed the tests and is being arrested for DUI. However, the video in our record never resumes after the first monitoring period.

Deputy Duke testified that the prosecutor's assistant informed him that the second observation period was not included in the video. The deputy further testified that after the insufficient breath tests, he turned off his recording in order to call his sergeant and discuss whether to try another breath test or take Kimbley for a blood draw. While Kimbley was providing the second set of breath samples, the deputy checked his recorder and noticed that it was off.

ed sufficient breath samples. The breath samples showed a result of .126 and .127. ITD later served Kimbley with a notice of administrative license suspension (ALS), pursuant to Idaho Code § 18–8002A, due to her failure of the breath test.

Kimbley requested an ALS hearing. A hearing was held telephonically on September 6, 2011. The hearing officer's findings of fact and conclusions of law and order was issued September 19, 2011, sustaining the suspension of Kimbley's driver's license.

Kimbley filed a petition for judicial review. On February 28, 2012, the district court vacated the suspension on the ground that the hearing officer's findings that the deputy complied with the fifteen-minute monitoring period were not supported by substantial and competent evidence. ITD timely appealed.

## II.

## ANALYSIS

### A. Standards

■ The Idaho Administrative Procedures Act (IDAPA) governs the review of ITD decisions to deny, cancel, suspend, disqualify, revoke, or restrict a person's driver's license. *See* I.C. §§ 49–201, 49–330, 67–5201(2), 67–5270. In an appeal from the decision of the district court acting in its appellate capacity under IDAPA, this Court reviews the agency record independently of the district court's decision. *Marshall v. Idaho Dep't of Transp.*, 137 Idaho 337, 340, 48 P.3d 666, 669 (Ct.App.2002). This Court does not substitute its judgment for that of the agency as to the weight of the evidence presented. I.C. § 67–5279(1); *Marshall*, 137 Idaho at 340, 48 P.3d at 669. This Court instead defers to the agency's findings of fact unless they are clearly erroneous. *Castaneda v. Brighton Corp.*, 130 Idaho 923, 926, 950 P.2d 1262, 1265 (1998); *Marshall*, 137 Idaho at 340, 48 P.3d at 669. In other words, the agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial and competent evidence in the record. *Urrutia v. Blaine County, ex rel. Bd. of Comm'rs*, 134 Idaho 353, 357, 2 P.3d 738, 742 (2000); *Marshall*, 137 Idaho at 340, 48 P.3d at 669.

The Court may overturn an agency's decision where its findings, inferences, conclusions, or decisions: (a) violate statutory or constitutional provisions; (b) exceed the agency's statutory authority; (c) are made upon unlawful procedure; (d) are not supported by substantial evidence in the record; or (e) are arbitrary, capricious, or an abuse of discretion. I.C. § 67–5279(3). The party challenging the agency decision must demonstrate that the agency erred in a manner specified in I.C. § 67–5279(3) and that a substantial right of that party has been prejudiced. *Price v. Payette County Bd. of County Comm'rs*, 131 Idaho 426, 429, 958 P.2d 583, 586 (1998); *Marshall*, 137 Idaho at 340, 48 P.3d at 669. If the agency's decision is not affirmed on appeal, "it shall be set aside ... and remanded for further proceedings as necessary." I.C. § 67–5279(3).

The administrative license suspension statute, I.C. § 18–8002A, requires that ITD suspend the driver's license of a driver who has failed a BAC test administered by a law enforcement officer. The period of suspension is ninety days for a driver's first failure of an evidentiary test and one year for any subsequent test failure within five years. I.C. § 18–8002A(4)(a). A person who has been notified of an ALS may request a hearing before a hearing officer, designated by ITD, to contest the suspension. I.C. § 18–8002A(7); *Kane v. State, Dep't of Transp.*, 139 Idaho 586, 588, 83 P.3d 130, 132 (Ct.App. 2003). The hearing officer must uphold the suspension unless he or she finds, by a preponderance of the evidence, that the driver has shown one of several grounds enumerated in I.C. § 18–8002A(7) for vacating the suspension. Those grounds are:

(a) The peace officer did not have legal cause to stop the person; or

(b) The officer did not have legal cause to believe the person had been driving or was in actual physical control of a vehicle while under the influence of alcohol, drugs or other intoxicating substances in violation of the provisions of section 18–8004, 18–8004C or 18–8006, Idaho Code; or

(c) The test results did not show an alcohol concentration or the presence of drugs or other intoxicating substances in violation of section 18–8004, 18–8004C or 18–8006, Idaho Code; or

(d) The tests for alcohol concentration, drugs or other intoxicating substances administered at the direction of the peace officer were not conducted in accordance with the requirements of section 18–8004(4), Idaho Code, or the testing equipment was not functioning properly when the test was administered; or

(e) The person was not informed of the consequences of submitting to evidentiary testing as required in subsection (2) of this section.

I.C. § 18–8002A(7). The hearing officer's decision is subject to challenge through a petition for judicial review. I.C. § 18–8002A(8); *Kane*, 139 Idaho at 589, 83 P.3d at 133. The burden of proof at an ALS hearing is on the individual requesting the hearing, and that burden is not satisfied merely by showing that the documents received by ITD are inadequate. *Kane*, 139 Idaho at 590, 83 P.3d at 134.

### B. Fifteen–Minute Monitoring Period

Pursuant to I.C. § 18–8004(4), the Idaho State Police are charged with promulgating standards for administering tests for breath alcohol content. *State v. DeFranco*, 143 Idaho 335, 337, 144 P.3d 40, 42 (Ct.App.2006). To carry out the authority conferred by that statute, ISP issued operating manuals as well as SOP for the maintenance and operation of breath test equipment. *In re Mahurin*, 140 Idaho 656, 658, 99 P.3d 125, 127 (Ct.App. 2004). Noncompliance with these procedures is a ground for vacating an administrative license suspension under I.C. § 18–8002A(7)(d). *Mahurin*, 140 Idaho at 658–59, 99 P.3d at 127–28. In this case there is no evidence in the record or argument based upon applicable manuals.[2]

The applicable SOP for breath alcohol testing provided that "[p]rior to evidentiary

breath alcohol testing, the subject/individual should be monitored for at least fifteen (15) minutes.... During the monitoring period the subject/individual should not be allowed to smoke, drink, eat, or belch/burp/vomit/regurgitate." 6.0 Idaho Standard Operating Procedure Breath Alcohol Testing, Section 6.1. The SOP noted that "[d]uring the monitoring period, the Operator must be alert for any event that might influence the accuracy of the breath alcohol test." Section 6.1.4. "If mouth alcohol is suspected or indicated, the Operator should begin another 15–minute waiting period before repeating the testing sequence." Section 6.1.4.1. If the subject vomits or regurgitates, the fifteen-minute monitoring period must begin again. Section 6.1.4.2. Pursuant to Section 6.1.4.3, if there is doubt as to events occurring during the monitoring period, the officer should look at the results of the two samples for evidence of potential alcohol contamination, and the officer is referred to Section 6.2.2.2. Section 6.2.2.2 states that "[t]he results for duplicate breath samples should correlate within 0.02 to indicate the absence of alcohol contamination in the subject/individual's breath pathway...."

This Court has addressed the fifteen-minute monitoring period in *Bennett v. State, Dep't of Transp.*, 147 Idaho 141, 206 P.3d 505 (Ct.App.2009). We noted that the purpose of the monitoring period is to rule out the possibility that alcohol or other substances have been introduced into the subject's mouth from the outside or by belching or regurgitation. *Id.* at 144, 206 P.3d at 508. *See also State v. Carson*, 133 Idaho 451, 453, 988 P.2d 225, 227 (Ct.App.1999). To satisfy the monitoring requirement, the level of surveillance "must be such as could reasonably be expected to accomplish" that purpose. *Bennett*, 147 Idaho at 144, 206 P.3d at 508. Furthermore, in *DeFranco*, this Court commented that the fifteen-minute monitoring period is not an onerous burden and that "[t]his foundational standard ordinarily will be met if the officer stays in close physical proximity to the test subject so that the officer's senses of

---

**2.** These manuals have changed over time. The courts have periodically looked to these manuals for information regarding the requirements of the monitoring period. *See State v. Carson*, 133 Idaho 451, 453, 988 P.2d 225, 227 (Ct.App.1999). However, the requirements appear to be focused on the SOP.

sight, smell and hearing can be employed." *DeFranco*, 143 Idaho at 338, 144 P.3d at 43. Therefore, "[s]o long as the officer is continually in [a] position to use his senses, not just sight, to determine that the defendant did not belch, burp or vomit during the [monitoring] period, the observation complies with the training manual instructions." *Bennett*, 147 Idaho at 144, 206 P.3d at 508; *cf. Carson*, 133 Idaho at 453, 988 P.2d at 227 (holding that the arresting officer's ability to supplement his visual monitoring of Carson with his other senses was substantially impaired by numerous sources of noise, the officer's own hearing impairment, and his position facing away from Carson while transporting him during the monitoring period).

██ The evidence presented at Kimbley's administrative hearing was the deputy's probable cause affidavit, the video recording of the first fifteen-minute monitoring period, the deputy's testimony, and Kimbley's own testimony. During the administrative hearing, Deputy Duke testified that he conducted two separate fifteen-minute monitoring periods.[3] Regarding the first fifteen-minute monitoring period, the deputy stated that Kimbley was placed in the custody of the jail deputy to be searched, as he checked the time on the breath test machine and noted it in his report. According to the deputy, he could "stand with her and look into the room and check the time. . . ." He then escorted Kimbley into an interview room, gave her a copy of the ITD license suspension form, and played the advisory recording. During this time, the deputy observed Kimbley. After approximately thirteen to fourteen minutes, he escorted Kimbley into the breath testing room, where he began entering information into the machine. At the end of the first monitoring period, Kimbley submitted to the breath test, but failed to provide a sufficient sample.

The deputy then testified that he started another fifteen-minute monitoring period. Regarding the second fifteen-minute monitoring period, the deputy testified, he "just observed her the whole time" and did not replay the advisories. The deputy further explained he "walked her back into the inter-

view room and essentially just sat in the room with her." According to the testimony, only the deputy and Kimbley were in the interview room, but the other jail deputies were in their office, which was approximately eight feet away with two windows in between the two rooms. He then told the jail deputies his new start time and the time he would like to take samples. He waited approximately thirteen minutes with Kimbley, before he escorted Kimbley back into the breath testing room where he programmed the machine. Thereafter, Kimbley submitted the breath samples of .126 and .127.

Kimbley next testified at the administrative hearing. According to Kimbley's testimony, she was brought into the jail and patted down—she did not notice where the deputy was or what he was doing at this time. She further testified that after the search she was taken into a room with a table and chairs and listened to an audiotape. She was then taken into another room and given a breath test. Kimbley testified at that point, she was unaware of the first fifteen-minute monitoring period. Her first breath tests, she was told, did not provide sufficient samples and would be marked as a refusal.

Kimbley testified that after the first monitoring period, she was taken back into the interview room where the deputy previously played the audio tape.

A. But I—but after these tests were done, I—the first set of tests were done, I was taken into a little room with a table and chairs.

Q. Is that the same room you were in earlier?

A. Yeah. And I was told to wait there and they were going to give me fifteen minutes until the next tests were done, and—

Q. Okay. So this was a different room from the breath testing machine; this was the other room—

A. Yes.

Q. —where you had earlier listened to the audiotape?

---

3. As noted, there is no video of the second fifteen-minute monitoring period.

A. Yes, it was.

Q. Okay. And was just Deputy Duke in there with you at that time?

A. He was, for part of the time.

Q. He was for part of the time. *Well,* what happened?

A. Yeah.

Q. Why was he—did he leave the room?

A. Yeah, he did.

Q. Where did he go? Did you see where he went?

A. He sat with me for—he sat with me for a few minutes, and then he got up and went to another office where the other officers were at and where they sit and—where the other officers sit down there and hang out. He was walking back and forth.

Q. Okay. So he walked back and forth between the two rooms?

A. Yeah.

Q. So how—how many times did he come into the room and then leave the room, do you recall?

A. I—I don't. I probably—probably, two or three times.

Q. Okay. Now, could you describe for me the location of the room where you were sitting in relation to the room where he was walking to? Is it-how far away is it?

A. I don't know. I'm not very good with measurements.

Q. Is it—is it—are they completely adjacent? Is there a hallway in between?

A. Oh, they're—they're—theyre pretty much adjacent to each other, but he did go out of sight from me throughout a couple of them times that he walked away.

A. Okay.

A. He went into-he went into a different office.

Following *Kimbley's* testimony, the hearing officer allowed the deputy an opportunity to comment. The deputy further explained:

I would just like to add that I may have had Ms. Kimbley move back into the original room while I was in another room making a phone call to my sergeant, and then come back in to tell her maybe we're going to give another breath test, and then go back into the Intox room to check the time. And that could have explained why I was in and out of the room. But given the time elapsed since that and I don't have my recording to review, unfortunately, I can't be totally sure about that.

The hearing officer concluded that the deputy complied with the fifteen-minute monitoring period. The hearing officer specifically found:

1. Deputy Duke's affidavit states the evidentiary test was performed in compliance with Idaho Code and ISPFS SOPs.

2. ISPFS SOP § 6.1 provides a fifteen-minute monitoring period is required prior to an evidentiary test. (SOPs are located at: *www.isp.idaho.gov./ forensic/alcohol.html* ).

3. Unlike Kimbley's ALS testimony, the DVD (Exhibit C) at 22:21:33 provides Deputy Duke informing Kimbley about the fifteen-minute monitoring period and the reasons for the monitoring period.

4. Exhibit C shows Deputy Duke informed the jail staff that he started Kimbley's first monitoring period at approximately 22:12:41.

5. During the first monitoring period, Exhibit C (between 22:12:47 and 22:29:53) provides Deputy Duke continuously in close proximity to Kimbley, able to use a combination of all of his senses to monitor Kimbley, and that he did not leave Kimbley's presence at any time before Deputy Duke had Kimbley blow into the Intoxilyzer 5000EN.

6. Exhibit C additionally shows Kimbley's first monitoring period was in excess of fifteen minutes.

7. Deputy Duke's ALS testimony noted the reasons for leaving Kimbley's location after Kimbley's first breath test and prior to the start of her second monitoring period.

8. Kimbley's two breath test printouts (Exhibits 2 and 3) demonstrate suffi-

cient time for Deputy Duke to communicate with his sergeant and restart Kimbley's fifteen-minute monitoring period.

9. Kimbley's testimony noted she assumed the number of times Deputy Duke left her presence and she had no idea when or if he had restarted the monitoring period.

10. Kimbley's recollection of what occurred between the first and second evidentiary breath testing sequence is based upon a time when her memory was impaired (see Exhibit 4's DUI NOTES) and having an alcohol content that was in excess of the legal limit to drive a vehicle (see Exhibit 3).

11. It is reasonable to deduce if Deputy Duke conducted Kimbley's first evidentiary breath testing sequence in accordance with ISPFS SOPs, by natural habit, Deputy Duke would follow proper procedures again when he restarted the monitored period for Kimbley's second evidentiary breath testing sequence.

12. Kimbley's two subject tests noted in Exhibit 3 being within .02 of each other as required by SOP § 6.2 strongly shows the absence of alcohol contamination in Kimbley's breath pathway as the result of an improper monitoring period (see SOP § 6.2.2.2).

13. Kimbley's evidentiary test was performed in compliance with Idaho Code and SOPs.

The district court, on judicial review, vacated the license suspension. The district court held that the finding was not supported by substantial evidence in the record because the deputy did not properly monitor Kimbley for fifteen minutes prior to administering the second breath test.

If it were just a pure credibility determination, I think I would throw in with you. But my dilemma is when Kimbley testifies that he [Deputy Duke] left the room during the second period, and the hearing officer gives Duke the opportunity to respond to that, he doesn't—he doesn't dispute her characterization of the testimony.

And if he left the room, then I think the procedure hasn't been followed. And so now I'm—she has direct testimony that he left the room during the second testing period. And he doesn't contradict that. So, I don't know that that's truly a credibility determination. That's my dilemma, right there.

. . . .

Well, I think if Duke had gotten on the stand after Kimbley testified and said, I stayed with her the entirety of that time, I'd affirm. But I don't have that testimony.

. . . .

But I think—and maybe this is more philosophy than law, that when a device is being used to say, you no longer get to drive, that you ought to scrupulously comply with whatever requirements have been set out, and without that scrupulous performance, I'm not willing to say that that test is valid.

And then I may be at the far end of the spectrum as far as district judges are concerned in saying that, but that's—that's really where I am. And until the Court gives me better guidance that I'm being too strict in my application of the regs, I'm probably going to continue to apply the regs in the way that I have.

. . . .

Had Duke said, no, I sat with her the entirety of the fifteen minutes, I would affirm, but because he vacillates in his response to her testimony, I'm setting aside the ALS determination.

The district court appears to have misunderstood the statement made by the deputy. Without any context, which would have been provided by a question posed to the deputy, he stated that his coming and going from the room was at the time he moved Kimbley back to the original room between the two monitoring periods. He did not state that his movement in and out of the room was during the second monitoring period. Consistently, he had previously testified that he in fact was in and out of the room between the two monitoring periods to consult with his sergeant. Further, the district court stated that the court would affirm if only the

deputy had, in his comment, denied Kimbley's testimony that he left the room during the second monitoring period. However, the deputy had previously testified that he had not left the room during the second monitoring period. He was under no further obligation to expressly deny her testimony to the extent he even understood it to suggest that he left the room during the second monitoring period. The deputy had testified that he properly monitored Kimbley during the second monitoring period and had not left the room during that time. Even if Kimbley's testimony was that the deputy did leave the room on two-to-three occasions during the second monitoring period, that testimony is simply contradictory to the deputy's prior testimony that he did not do so. It remains the hearing officer's province to resolve conflicting testimony. The hearing officer's determination that the second monitoring period complied with applicable standards is supported by substantial and competent evidence in the record and

the findings have not been demonstrated to be clearly erroneous.[4]

## III.

## CONCLUSION

Substantial evidence exists in the record to support the hearing officer's findings that the deputy properly conducted the fifteen-minute monitoring period. Therefore, we reverse the district court's order upon judicial review vacating the hearing officer's decision suspending Kimbley's driver's license.

Judge LANSING and Judge MELANSON concur.

---

4. Kimbley makes a number of arguments regarding credibility. Kimbley's credibility arguments center on her belief that the deputy's testimony was inconsistent and contradicted her testimony which, according to her, was wholly consistent. However, the credibility determination was resolved by the hearing officer in favor of the deputy. Her arguments do not change our sufficiency of the evidence analysis. We conclude that substantial and competent evidence in the record supports the hearing officer's determination.